# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

E.C. STYBERG ENGINEERING COMPANY,

Plaintiff,

v.

EATON CORPORATION,

Defendant.                                          No. 03-C-0571-DRH

## MEMORANDUM and ORDER

HERNDON, District Judge:

## I. Introduction

In May 2003, E.C. Styberg Engineering Company ("Styberg") filed suit against Eaton Corporation ("Eaton") in the Circuit Court of Racine County, Wisconsin (Doc. 1). Styberg's complaint alleges breach of contract and seeks $3,410,204.00 from Eaton. Eaton removed the case to this Court on June 17, 2003 based on **28 U.S.C. § 1332** and **28 U.S.C. § 1441** (Docs. 2).

The case proceeded to bench trial in this Court on June 5, 2006 an ended on June 8, 2006. At the close of trial, the Court directed the parties to file proposed findings of fact and conclusions of law. Those findings/conclusions have now been filed. Having heard the evidence, having reviewed the parties' submissions, and in accord with **FEDERAL RULE OF CIVIL PROCEDURE 52**, the Court finds and concludes as follows.

Page 1 of  23

## II.  Findings of Fact

1.   Styberg is a Wisconsin corporation with its principal place of business located at 1600 Goold Street, Racine, Wisconsin 53404.

2.   Eaton is an Ohio corporation with its home offices located at 1111 Superior Avenue, Cleveland, Ohio 44114.

3.   The matter in controversy exceeds, exclusive of interest and costs, $75,000.00.

4    Eaton manufactures, among other things, motor vehicle parts and accessories. It is the supplier of transmissions to the manufacturers of trucks.

5.   Styberg is a contract manufacturer, meaning that it generally produces unique parts for its customers pursuant to the customers' specific drawings and designs.

6.   Styberg produces a wide range of products, including transmission components, marine components, aerospace parts, and fork truck applications.

7.   Styberg works with more than 200 different companies, including prominent international conglomerates like Allison Transmissions, BAE Systems, Massey Ferguson, Mercury Marine, GROB Switzerland, and Rolls Royce (for which Styberg makes engine components used in the U.S. military's C-130 Hercules transport carrier) and, so, is well versed in contractual matters involving complex manufacturing matters.

8.   Styberg manufactured and supplied an "Inertia Brake Assembly," part number

A-6971, which was used by Eaton as a component in transmissions it supplied to certain truck manufacturers.

9.      In late 1996, Eaton began to work with Styberg to develop an inertia brake; both companies providing input on the design and development of the product.

10.     Initially Eaton was looking for one component for the inertia brake, and through 1997 and 1998, ECS produced specific components for the brake.

11.     In 1998, Styberg built a prototype for the brake, and in early 1999 it did a limited quantity release of these brakes.

12.     Throughout the parties' relationship, the brake design was subject to revision.

13.     As late as December 11, 2001, Styberg was still revising the design, with input from Eaton.

14.     In March and April 1999, the parties discussed an agreement under which Styberg would produce larger quantities of brakes.

15.     Eaton wanted Styberg to increase its monthly production capacity.

16.     Styberg wanted Eaton to commit to buying a minimum number of parts to cover the expenses Styberg had incurred and would later incur.

17.     Both Eaton and Styberg rely on written sales contracts.

18.     In the first paragraph of its "Conditions Of Sale And Manufacturing Practices," Styberg states that "[a]ll orders are subject to written acceptance by Seller at its offices."

19.     This condition was found on the reverse of Styberg's quotation form, which it

sent to Eaton with its "A-6971 Quote 9/9/99 REV."

20. Styberg never accepted in writing Eaton's alleged 13,000 unit order.

21. Eaton's form purchase orders contained similar language, stating that the seller must "[e]xecute attached Purchase Order—Acknowledgment and return to buyer promptly. No other form of acceptance is binding on buyer."

22. Styberg relied on written purchase orders to avoid miscommunications regarding performance, and specifically how many units were ordered and when they were to be shipped.

23. Styberg testified that all 200 to 300 of its customers used purchase orders and that this is how Styberg "did business."

24. Styberg did not execute or return a "Purchase Order— Acknowledgment" for the alleged 13,000 unit order.

25. In early July 1999, Styberg sent its "A-6971 Quote 7/8/99 Rev.", which proposed that a total of 13,000 brakes would be sold to Eaton at an average cost of $544.88 per unit.

26. The quote noted that the cost would be $31 higher if Eaton was using a snap-in coil design.

27. That quote stated as further conditions: (i) that Eaton would make Styberg its "primary source" (defined to mean Eaton would buy at least 12,000 A-6971 units annually for five years); and (ii) that after 6000 units were sold parties would "re-evaluate the quoted prices and delivery schedule and will adjust up or down accordingly."

Page 4 of 23

28. In late July 1999, Eaton engineer Al Davis was at the Styberg plant and spoke with John Baker and Ron Jones. Baker was Styberg's principal contact with Eaton. Ron Jones was Styberg's vice president of manufacturing.

29. Styberg had invested $1.2 million in capital even though it had no long-term agreement with Eaton.

30. Jones told Davis that Styberg needed a "commitment" from Eaton to cover its capital expenditures.

31. Specifically, Jones told Davis that Styberg needed a commitment for 60,000 brake units, but would accept a commitment for only 20,000 if Eaton would provide substantial additional capital investment.

32. Jones also stated that to make the A-6971 brakes Styberg needed $343,000 in tooling money and needed 26 weeks to get the necessary tooling.

33. Eaton did not agree to these requirements.

34. On July 29, 1999 Lisa Fletcher, an employee with Eaton's buying group, sent a tooling purchase order to Styberg.

35. With that tooling purchase order, Fletcher sent a cover letter stating that "with this $293,000 investment Styberg will be able to produce assembly A-6971 at a rate of up to 1,400 units per month, with an approximate lead time of four months."

36. The tooling purchase order itself states as a condition the range of "1,000 – 1,400 per month."

37. Styberg's John Baker was told that Styberg needed to be able to manufacture

1,400 units per month.

38. The July 29, 1999 letter went on to note that "Eaton will purchase a minimum of 13,000 units at an average price of $544.88 by July 29, 2001."

39. Styberg would need to produce and ship 13,000 units over at most a 24 month period—an average of 542 brakes per month.

40. Although Styberg describes this letter as a "commitment," the letter refers only to a commitment as to the $293,000 in tooling.

41. In contrast to Styberg's "A-6971 Quote 7/8/99 Rev.", the Fletcher letter did not specify that Styberg would be Eaton's primary supplier; did not discuss the additional $31 in unit price for a different design; did not require that Eaton would purchase additional brakes over a five year period; and did not permit the parties to re-negotiate price.

42. The Fletcher letter stated no exceptions on its terms for tooling costs, unit price, minimum unit purchases, monthly production, or production schedules.

43. Fletcher had no authority to enter into a contract on Eaton's behalf.

44. In its pre-trial admissions, Eaton admitted that Fletcher sent the July 29, 1999 pursuant to the "scope of her authority" at Eaton, but this authority did not include the right to enter into agreement on Eaton's behalf.

45. Fletcher had no such authority. She testified by way of deposition that this letter was one part of the negotiations between the parties, and that to be bound Eaton would have had to issue a purchase order.

46. Styberg knew Fletcher did not have authority to bind Eaton to a contract.

47. During a September 1, 1999 telephone conference, another Eaton employee (Miles Tuttle) needed to make the decision regarding the critical issue of whether Eaton would accept Styberg's monthly production capacity.

48. Even Tuttle did not have enough authority to agree to increased volume at the cost of Eaton having to invest more money in the project.

49. Styberg had already told Eaton that it needed Eaton to buy at least 60,000 brakes to make a contract worthwhile, needed $343,000 in tooling, and needed about six months to get the tooling in place.

50. Styberg rejected every term proposed in Fletcher's letter.

51. Styberg did not believe the 13,000 units were sufficient to justify its investment, and it wanted a minimum commitment of 25,000 to 30,000 units.

52. Styberg could not meet the production condition of "1,000 – 1,400 per month."

53. On August 24, 1999, Styberg's John Baker called Lisa Fletcher to discuss the proposed terms.

54. During this conversation Baker said that Styberg would need an additional $2.9 million of investment to get to the production levels required in Fletcher's letter.

55. Baker also told Fletcher that "13,000 doesn't cover it," and Styberg wanted Eaton to agree to buy "25 to Ron's 30,000" units.

56. Baker told Eaton's Lisa Fletcher that the $293,000 in tooling would not cover

engineering expenses for some other components (which would cost another $31,000) and would not cover tooling to reflect a change in casting design (which would cost $50,000 more).

57. On August 17, 1999, Baker left a message asking whether Eaton would agree to provide the additional tooling money and if Eaton would agree to accept Styberg's production of only 300 to 400 units per month.

58. Because of this failure to agree on terms, Baker and Fletcher set up a conference call for September 1, 1999.

59. Fletcher and Miles Tuttle represented Eaton on the conference call. For Plaintiff, there was Baker; Ron Jones, Styberg's vice-president for manufacturing; and Mike Budish, Styberg's vice-president for finance.

60. During that conference call, the parties discussed the need for an additional $49,000 in tooling money to cover the longer casting design being used, which was not included in the tooling figures from Fletcher's letter.

61. The parties negotiated regarding quantity, and Styberg told Eaton that 13,000 units was not enough to cover project expenses and it needed at least a 30,000 unit commitment.

62. The parties also continued to negotiate price, Eaton investment, and quantity: specifically, if Eaton would not buy 30,000 units, Styberg said it would charge $525 per unit based on at least a $3.2 million investment from Eaton and a 13,000 unit order.

63. The parties also negotiated regarding the critical issue of Styberg's monthly

production capacity. Baker told Eaton that, instead of producing the 1,000 to 1,400 units per month stated in the Fletcher letter, Styberg needed to "adjust" to 300 to 400 units per month.

64. Eaton's Miles Tuttle said a higher volume (400 to 500 units per month) could be acceptable but wanted to know the maximum number Styberg could produce if there was no additional capital investment from Eaton and if Eaton purchased only 13,000 units.

65. Eaton told Styberg that it would "mark up the document and get to Styberg" regarding a potential agreement.

66. Eaton needed information as to Styberg's maximum capacity by September 15, 1999, because that was the date (called "D-Day" during the conference call) when Eaton would make a decision on the proposal.

67. Also on September 1, 1999, Eaton sent Styberg a letter notifying it of a change in Eaton's purchasing software system.

68. Under the new system, Eaton used a five digit purchase order code for its orders.

69. On the same day, Eaton sent Styberg a letter specifically referring to the inertia brake negotiations, as well as a new purchase order for tooling necessary for the production of these brakes.

70. Eaton had already sent a new purchase order, with the new purchase order number, for the inertia brakes themselves.

71. That purchase order, dated August 16, 1999, lists no specific quantity and

states the unit price as $779.70—not $544.80 (the price stated in Fletcher's letter), or $595 (the price listed on Styberg's price quotes), or $626 (the price Styberg claims it charged Eaton under the alleged agreement).

72. Plaintiff claims that the alleged agreement was related to this purchase order.

73. This purchase order is inconsistent with the alleged agreement with respect to two critical terms, price and volume.

74. As Styberg admits, Eaton never issued a purchase order stating terms consistent with the contract Styberg now tries to enforce.

75. During the September 1, 1999 conference call, the parties also discussed a controversy over pricing earlier brake shipments.

76. Styberg billed Eaton at the wrong rate, and the amount Eaton paid did not match the (higher) price Styberg thought applied to those specific shipments.

77. The parties needed to determine how many brakes had been shipped with each order, what price was actually charged and paid, and what price should have been charged and paid.

78. This was not the only time Styberg was confused on what price it had charged Eaton on a shipment.

79. Styberg's chief financial officer (Mike Budish) testified that his first damage report was wrong, in part because he used the wrong price when he factored in an April 2000 shipment.

80. Specifically, he admitted that he made a "mistake" when he tried to determine what price Eaton had paid for the 240 brakes that it was sent in April 2000.

Case 2:03-cv-00571-DRH   Filed 11/27/06   Page 10 of 23   Document 198

81.   In his first report, he used a price of $626 per unit, which is the price listed on the invoice and paid by Eaton.

82.   On his second report, Budish decided he should have used $595 per unit.

83.   In response to the September 1, 1999 conference call, Styberg sent Eaton a new price quote with the information requested.

84.   This quote was captioned "A-6971 Quote 9/9/99 REV."

85.   Other than the date, the heading was identical to the one used for the July 8, 1999 quote, and it identified the document as a "quote" rather than an acceptance or contract.

86.   Styberg generally used its quotes as offers rather than as a means of finalizing or accepting a contract.

87.   According to the quote, Styberg would ship 300 units in February 2000, and then would continue to ship between 300 and 600 units per month until April 2002.

88.   Although the average unit price over the life of the quote was listed as $544.92, the quote noted that this price was contingent on adoption of a snap-in coil design and that an additional $31 would be added to the unit price with the existing coil design.

89.   The quote also stated several conditions.  First, delivery dates would "be based on a starting date four months after an agreement on casting design, unit price, and delivery schedules."

90.   In addition, Styberg's quote stated that "[a]t the present time, we have

determined that 300 to 400 units a month is our maximum output. We will continue to try and improve on that quantity per the above schedule."

91. In addition, Styberg reserved the right to unilaterally raise the price once 6,000 units had been shipped.

92. Specifically, the quote added a condition allowing Styberg to "reevaluate the quoted prices and delivery schedule" after 6,000 units were shipped and "adjust up or down accordingly."

93. At trial, Styberg's chief financial officer admitted that the price would only ever go up based on changes to the brake design.

94. If Styberg's price rose, it could not meet the average unit price of $544.80 stated in Fletcher's July 29, 1999 letter.

95. Styberg never accepted Eaton's requirement that it be able to produce up to 1,400 units per month with a four month lead time.

96. Styberg never accepted Eaton's requirement that it produce 13,000 units by July 1, 2001.

97. On September 27, 1999, John Baker sent an e-mail to his colleagues at Styberg, which he claimed was based on a telephone call he took from Eaton employee Lisa Fletcher.

98. Baker asserted that during this conversation Fletcher told him that Styberg's quote was "acceptable."

99. Baker does not explain why he was seeking Fletcher's acceptance, since he earlier testified that the contract is based solely on the July 27, 1999 letter.

100. Fletcher had no authority to accept the quotes .

101. In its pre-trial admissions, Eaton admitted that Fletcher sent the July 29, 1999 letter pursuant to the "scope of her authority" at Eaton, but this authority did not included the right to enter into agreements on Eaton's behalf.

102. Plaintiff knew or should have known this was outside Fletcher's authority.

103. During the September 1, 1999 conference call, Miles Tuttle served as Eaton's negotiator on this point (the critical issue of whether Eaton would accept Styberg's monthly production capacity).

104. The evidence at trial demonstrated that Baker's September 27, 1999 e-mail was, at best, inaccurate and unreliable.

105. Baker took notes of his conversations with clients, and he testified that these notes were "generated at the time the discussion took place" and "accurately record[ed], best of [his] recollection, events as they occurred."

106. Though Baker claims he spoke with Eaton employee Lisa Fletcher, the notes from September 27, 1999 contain the notice "LM," which Baker elsewhere testified meant that he left a message rather than had an actual conversation.

107. None of the notes dated between September 1, 1999 and September 28, 1999 mention any acceptance by Eaton of the terms in Styberg's quote.

108. The only possible references to Styberg's quote in Baker's notes regarding the September 27, 1999 message are the cryptic notations "have no info on it" and "is it real?!"—both of which suggest that Baker knew that Eaton did not accept the quote and that there was no contract.

109. Styberg presents no other support for Baker's erroneous claim that Eaton accepted the terms of its quote.

110. Styberg could not meet the average price stated in Fletcher's July 29, 1999 letter if the unit price was consistent with Styberg's price quotes.

111. In April 2000, Styberg shipped 240 brake units to Eaton at a price per unit of $626.

112. This April 2000 shipment was less than half the size of the minimum shipment Eaton said might have been acceptable during the parties' September 1, 1999 telephone conference.

113. This April 2000 shipment was smaller than the first shipment described in Styberg's "A-6971 Quote 9/9/99 Rev."

114. The unit price for this April 2000 shipment is inconsistent with the price listed in the July 29, 1999 letter.

115. The per unit price charged for this April 2000 shipment made it impossible for Styberg to comply with the price terms from the July 29, 1999 letter.

116. Styberg relies on Fletcher's July 29, 1999 letter as the core of its claims against Eaton.

117. Styberg's discovery responses cite the letter as the sole basis for its claims against Eaton.

118. All Styberg witnesses testified that the letter is at least part of any alleged agreement.

119. However, at the close of its case, Plaintiff's counsel was not able to tell the

Court what written documents showed offer, acceptance, and mutual assent as to the critical terms of the parties' alleged contract.

120. John Baker testified that the contract was the letter alone, but later admitted that in late August 1999 he was still looking for confirmation that Eaton had agreed to terms different than those listed in the letter.

121. Mike Budish testified that the contract was the letter plus Styberg's "A-6971 Quote 7/8/99 Rev.", but he was not able to explain why those two documents differed on critical terms.

122. Budish had earlier sworn to the accuracy of Styberg's discovery responses, which state that the sole basis for its claims is the Fletcher letter.

123. According to Ron Jones, Styberg's vice-president for manufacturing, the letter was so inconsistent with the "A-6971 Quote 9/9/99 Rev." that there was no way both could be part of the same agreement.

124. Jones testified that the July 29, 1999 letter was the parties' agreement, but he also stated that the terms of that letter were a "mistake," that Styberg could not meet these terms, and that Styberg never accepted those terms.

125. For example, Jones said the monthly volume term was wrong because Styberg could not make 1,400 units per month, and he said that the four-months' lead time described in the letter was also incorrect.

126. This four-months' lead time would allow Styberg no time to ramp up its production, so actual compliance with the letter would have forced Styberg to immediately begin producing up to 1,400 brakes per month, well beyond its

Case 2:03-cv-00571-DRH   Filed 11/27/06   Page 15 of 23   Document 198

actual capacity.

127. Plaintiff's president, Ernie Styberg, Jr., initially testified that the alleged agreement consisted of the July 29, 1999 letter and Eaton's blanket purchase order, No. 12875. This is consistent with his correspondence with Eaton, which he said had been written with advice and assistance of legal counsel.

128. He later changed his mind, saying "there's a lot of things a part of the contract," and saying the September 9, 1999 quote might also have been part of the alleged contract.

129. During the course of their business relationship, Eaton incurred substantial costs, paying Styberg in excess of $2.7 million for brakes, tooling, capital investment, parts, and other costs.

130. Styberg claims that it incurred significant expenses based on Eaton's alleged commitment to purchase 13,000 brakes.

131. Specifically, it sent a letter claiming that it incurred inventory and capital expenses "to insure Eaton's requirements to produce 13,000 units by July 29, 2001, per Eaton's PO letter dated July 29, 1999."

132. This letter does not say that Eaton actually agreed to purchase 13,000 units or that the parties had an enforceable contract regarding those units.

133. In fact, Styberg incurred almost all of its capital costs before July 29, 1999.

134. All the heavy equipment Styberg purchased to make the A-6971 brake had been ordered before July 29, 1999, and Styberg had taken possession of all but one of these machines.

135. Moreover, Styberg actually rejected the production terms proposed in the July 29, 1999 letter.

136. It could not produce the 1,000 to 1,400 units per month specified in the tooling purchase order, and its quotes set forth different terms for the alleged agreement.

137. The heavy equipment purchased by Styberg is not unique in the industry and could be used (by Styberg or another manufacturer) in hundreds of different applications.

138. Styberg did not have anyone trying to find new jobs to reconfigure this machinery for other work.

139. In December 2002, Eaton offered for settlement purposes to purchase Styberg's inventory for about $940,000, based on the alleged value of the inventory Styberg claims to hold.

140. Styberg held $42,000 of inventory for the A-7067 brake, a different model of inertia brake for which there as no large contract and which Eaton only purchased in small quantities.

141. Inventory figures for the A-6971 brake vary wildly, ranging from a low of 200 parts for one component to a high of 14,000 for another component.

142. Styberg built up its inventory stock as a hedge on future shortfalls and to avoid problems with difficult suppliers.

143. In reporting to its independent auditors the value of its claims against Eaton, Styberg based its reports on the value of the inventory it holds rather than its

lost profits or revenue.

144.  The value Styberg has assigned to its A-6971 inventory has varied wildly.

145.  These values have fluctuated even though its chief engineer for the project (John Baker) said the inventory was securely packaged by Styberg, was put into storage, and was not handled other than to be counted.

146.  Styberg's chief financial officer said there was not even any reason to re-count the inventory: it was a "waste of time" to recalculate the inventory each year, because "there was no change in inventory quantities" and he was just going to use the same value in later audit reports.

147.  In reports to outside auditors, the inventory value was based on its value as an element of damages in Styberg's claims against Eaton.

148.  In 2001, the auditors were told that the inventory was worth $730,600. The following year, the value shrunk to $631,000. The year after that, it shrank still further to $607,000.

149.  According to Styberg's most recent financial information, the inventory is now being held on its books at a value of $469,000.

150.  In Budish's first damage report for trial, he stated the inventory was worth $503,677.

151.  After reviewing Eaton's expert report, Budish decided to revise his damages analysis, lowering Styberg's overall damages but increasing inventory value to $876,383.

152.  Budish based this second, larger, calculation on what he believed was the "sale

Case 2:03-cv-00571-DRH   Filed 11/27/06   Page 18 of 23   Document 198

value" of the inventory.

153. This "sale value" included a 15% markup on all parts Styberg purchased from third parties.

154. This charge was applied even if Styberg immediately sold the component, put it into another assembly, or otherwise used it.

155. This markup is not standard in the industry and is inappropriate unless the holder actually adds value to the parts in inventory.

156. In addition, Budish increased the value of other components in inventory by 20%.

157. He applied this inflation factor because Styberg had charged a comparable factor when Eaton purchased inventory of one specific part—the "tracking spring."

158. This premium reflects Styberg's internal pricing analysis, and Eaton did not pay the premium specifically as a holding charge or even know that the price it paid included the premium.

159. Plaintiffs claim Eaton paid only a 10% premium, which was doubled because Budish figured Styberg had held the rest of its inventory about twice as long as it had held the tracking springs.

### III. Conclusions of Law

1. This Court has jurisdiction pursuant to **28 U.S.C. § 1332** and **28 U.S.C §
1441**.

2.    Pursuant to the purchase orders between the parties, Ohio law governs the relationship between Eaton and Styberg Engineering. **Trial Exhibit 1011; *Fix v. Quantum Indus. Partners*, 374 F.3d 540, 552 (7th Cir. 2004); *S.A. Healy v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476 (7th Cir. 1995).**

3.    The statute of frauds requires that all sales of goods valued in excess of $500 must be evidenced by a written contract. **Ohio Rev. Code § 1302.04(A).**

4.    A buyer may limit the means by which its offer to purchase goods may be accepted. ***Foster v. Ohio State Univ.*, 41 Ohio App. 3d 86, 87-88, 534 N.E.2d 1220, 1222 (Ohio Ct. App. 1987).**

5.    To succeed on its claims, Styberg Engineering must prove that there was an offer, an acceptance, and mutuality of assent to the terms of the agreement. ***Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3, 770 N.E. 2d 58 (Ohio 2002); *Noroski* v. *Fallet*, 442 N.E.2d 1302, 1304, 2 Ohio St. 3d 77, 79 (Ohio 1982); *Zelina v. Hillyer*, 846 N.E.2d 68, 70, 165 Ohio App. 3d 255 (Ohio Ct. App. 2005).**

6.    Merchants may form a binding contract through the exchange of non-identical terms and conditions, but only where parties agree as to all terms over which they had specifically negotiated. **Ohio Rev. Code § 1302.10; *Alliance Wall Corp. v. Ampat Midwest Corp.*, 17 Ohio App.3d 59, 62, 477 N.E.2d 1206, 1211 (Ohio Ct. App. 1994); *Gen. Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1098 (6th Cir. 1994).**

7. Where a plaintiff has unambiguously rejected the offered terms of sale, it cannot enforce other terms to its benefit. ***Energy Marketing Services, Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 375 (S.D. Ohio 1999**).

8. A counteroffer constitutes a rejection of an offer once made, and an offer once rejected ceases to exist and cannot be later accepted. ***Energy Marketing Servs., Inc.*, 186 F.R.D. at 374**.

9. Partial performance cannot be the basis for finding the existence of a contract where parties disagreed as to negotiated terms of the alleged contract. ***Energy Marketing Servs., Inc.*, 186 F.R.D. at 374**.

10. Where "partial performance" is the basis for finding the existence of a contract, recovery is limited to the scope of the performance actually shown and a plaintiff cannot recover damages beyond that. **Ohio Rev. Code §1302.04(C)(3); U.C.C. 2-201, Comment 2; *Royal Doors, Inc. v. Hamilton-Parker, Co.* (Ohio Ct. App. April 29, 1993), No. 92AP-938, 1993 WL 141233 at \*5-6; *In re Augustin Bros.*, 460 F.2d 376, 381 (8th Cir. 1972); *Spiering v. Fairmont Foods Co.*, 424 F.2d 337, 339-340 (7th Cir. 1970)**.

11. A contract for production of specialty goods is exempt from the statute of frauds only if the manufacturer has made a "substantial beginning" to the production. **Ohio Rev. Code § 1302.04(C)(1); *see also Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858, 860-861 (1st Cir. 1990); *Vision Sys., Inc. v. EMC Corp.*, (Mass. Super. Feb. 28, 2005), No.**

Case 2:03-cv-00571-DRH   Filed 11/27/06   Page 21 of 23   Document 198

**034305BLS, 2005 WL 705107 at \*5-6;** *EMSG Sys. Div., Inc. v. Miltop Corp.* **(E.D.N.C. Oct. 19, 1998), No. 5:97-CV-493-BO(2), 1998 WL 1095078;** *Epprecht v. IBM Corp.* **(E.D. Pa. May 25, 1983), No. 82-2577, 1983 WL 160571.**

12. Based on the record, the Court finds that there was not a contract. Styberg could not meet and refused to accept any of the proposed terms. It needed additional money for tooling. It could not meet the monthly production targets set in the letter and purchase order. It needed to increase the unit price to cover design changes. It needed a higher total number of unit sales to cover its expenses. Finally, it needed more lead time and needed to extend the timetable by nearly a year. The parties never came to like terms of any kind of agreement. When asked of the Plaintiff to point to what constituted the agreement, Plaintiff was not able to do so in a manner that even came close in a legally satisfactory manner. For a company that did business on the written word of contracts, they were unable to produce one.

13. The Court finds in favor of Defendant Eaton Corporation and against Plaintiff E.C. Styberg Engineering Company.

### IV. **Conclusion**

The Court **FINDS** in favor of Defendant Eaton Corporation and against

Plaintiff E.C. Styberg Engineering Company.  Further, the Court **DIRECTS** the Clerk

of the Court to enter judgment reflecting the same.

**IT IS SO ORDERED.**

Signed this 27th day of November, 2006

/s/            David   RHerndon
**United States District Judge**

Case 2:03-cv-00571-DRH   Filed 11/27/06   Page 23 of 23   Document 198